UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
UNITED STATES OF AMERICA,         :

                  :

       v.                 :        **MEMORANDUM AND ORDER**
                  :        21-CR-350 (WFK)

YINKA OLANIYI,          :

                  :

        Defendant.     :
-------------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:**

On February 12, 2026, Yinka Olaniyi ("Defendant") pled guilty to four counts of Hobbs Act robbery and one count of attempted Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a). Plea Agreement (the "Plea") ¶ 1, ECF No. 102; Indictment ¶¶ 1–5, ECF No. 14.[1] The Court now sentences Defendant and provides a complete statement of reasons, under 18 U.S.C. § 3553(c), of those factors set forth by Congress in 18 U.S.C. § 3553(a). For the reasons set forth below, Defendant is hereby sentenced to sixty-three (63) months' incarceration; three (3) years of supervised release with both the standard and special conditions of supervision; $1,420.00 in mandatory restitution in accordance with the forthcoming Order of Restitution; forfeiture of U.S. currency and items identified in the preliminary Order of Forfeiture, ECF No. 105; and a $500.00 mandatory special assessment.

## I.    Background

### A.  Factual Background

Between February and June 2021, Defendant participated in four robberies and attempted another, all while brandishing a firearm. *See* Presentence Investigation Report (the "PSR") ¶¶ 11–15, ECF No. 107. Defendant's activities were unearthed by an investigation conducted by the Bureau of Alcohol, Tobacco, Firearms, and Explosives (the "ATF"), and the New York City Police Department (the "NYPD") after Defendant confessed to participating in the robberies. *See id.* ¶¶ 10, 16–17.

---

[1] Citations are to the docket in *United States v. Olaniyi,* 21-CR-350. Page pincites refer to the ECF page numbers assigned to a filing where available, and where no ECF heading is present, to the page numbers listed in the original filing.

1

On February 22, 2021, "[Defendant] entered a convenience store located at 686 Knickerbocker Avenue in Brooklyn, New York, brandished a firearm and demanded money." *Id.* ¶ 11. Defendant "remove[d] $300[.00] of United States currency from the cash register and fled on foot." *Id.*

On March 5, May 23, and May 29, 2021, "[Defendant] entered a delicatessen located at 735 Knickerbocker Avenue in Brooklyn, New York, brandished a firearm and demanded money." *Id.* ¶¶ 12–14. Defendant removed a total of $820.00 in U.S. currency from the cash register during the first two robberies "and fled on foot." *See id.* ¶¶ 12–13. However, Defendant's third entrance of the establishment "was thwarted by an individual who chased [Defendant] out of the delicatessen causing him to flee on foot before removing any United States currency from the cash register." *Id.* ¶ 14.

Lastly, on June 3, 2021, "[Defendant] entered a delicatessen located at 969 Seneca Avenue in Queens, New York, brandished a firearm and demanded money." *Id.* ¶ 15. Defendant "removed $300[.00] of United States currency from the cash register and fled on foot." *Id.*

In total, Defendant stole $1,420.00 in U.S. currency from those establishments. *See id.* ¶¶ 11–13, 15. No physical injuries resulted from any of the four robberies or the one attempted robbery. *See id.* ¶¶ 11–15

### B. Procedural History

#### 1. *Charges and Detention*

On June 13, 2021, "[Defendant] called 911 and voluntarily stated that he participated in a robbery[.]" *Id.* ¶ 16. Upon their arrival to Defendant's location in Brooklyn the same day, the NYPD arrested Defendant after "[he] again admitted to participating in a robbery." *Id.* At the

local precinct, Defendant waived his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), "and gave voluntary statements in an interview with the ATF and NYPD." *Id.* Defendant was presented with images and video surveillance footage of the robberies and confessed he was the individual in the images and videos. *Id.* ¶ 17. During his interview, Defendant also confessed his intention was to obtain money to pay rent and to purchase food and acknowledged he used a firearm to commit the robberies. *Id.*

On June 14, 2021, the United States filed a complaint against Defendant, charging him with Hobbs Act robbery and attempted Hobbs Act robbery in violation of 18 U.S.C. § 1951(a). ECF No. 1. On June 15, 2021, Magistrate Judge Marcia M. Henry held an arraignment and bail hearing as to Defendant, during which Defendant was ordered detained pending trial after he refused to be fitted for electronic monitoring. ECF No. 5.

On June 29, 2021, ATF and NYPD agents executing a search warrant for Defendant's address of record "recovered clothing items worn by [Defendant] during the robberies but did not locate a firearm." PSR ¶ 18. During questioning on June 13, 2021, Defendant stated he sold the firearm used in the robberies. *Id.* ¶ 17. To whom, the Court does not know.

On July 2, 2021, a U.S. Grand Jury returned a ten-count indictment against Defendant, charging him with four counts of Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a); one count of attempted Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a); and five counts of possessing and brandishing a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c). Indictment ¶¶ 1–10. The indictment also included criminal forfeiture allegations pertaining to all counts. *Id.* ¶¶ 11–14.

2.        *Initial Competency Examinations*

On July 30, 2021, defense counsel filed a motion for a competency evaluation pursuant to 18 U.S.C. § 4241(b), ECF No. 16, which the Court granted the same day. ECF No. 17. With the parties' consent, the Court appointed forensic neuropsychologist Dr. Chriscelyn Tussey to evaluate Defendant and prepare a report consistent with the requirements of 18 U.S.C. § 4247. ECF No. 19.

On April 22, 2022, defense counsel filed a letter providing a status update on Defendant's competency and arguing, based on Dr. Tussey's report and the record before the Court, the Court should find by a preponderance of the evidence Defendant suffered from a mental disease or defect rendering him mentally incompetent to assist properly in his defense. Def.'s Apr. 22 Letter at 4, ECF No. 32. The letter also stated the Government agreed the record supported a preliminary finding of Defendant's incompetence to understand the nature and consequences of the proceedings against him or to assist properly in his defense. *See id.* The parties further agreed if the Court found Defendant incompetent to assist properly in his defense, the Court should direct the Attorney General to hospitalize Defendant for treatment in a facility capable of providing neurological, psychiatric, and cognitive treatment for an initial period not to exceed four months. *See id.*

On April 26, 2022, the parties filed a joint motion and proposed order for the Court to endorse Dr. Tussey's conclusion Defendant suffered from a disease or defect rendering him mentally incompetent to the extent he was unable to assist properly in his defense. ECF No. 34. The parties requested Defendant be hospitalized by the Federal Bureau of Prisons (the "BOP") for a period of time not to exceed four months to determine whether he would attain the capacity to participate in his defense pursuant to 18 U.S.C. § 4241(d). *See id.* The proposed order also

directed the BOP to provide a status report detailing Defendant's medical treatment and monitoring after Defendant was in the facility for ninety days. *See id.* The same day, the Court held a competency hearing and marked and entered the Preliminary Order of Commitment, ECF No. 35, which was modified by request of the Government on May 2, 2022. ECF No. 37.

On June 27, 2023, Warden T. Scarantino of the Federal Medical Center Butner informed the Court Defendant's forensic evaluation had been completed and provided a certificate of restoration of competency to stand trial. ECF Nos. 38 and 39.

3.      <i>Indictment, First Change-of-Plea Hearing, and Trial Schedule</i>

On August 10, 2023, the parties filed a joint request for a hearing to decide whether Defendant had been restored to competency. ECF No. 40.

On October 12, 2023, after receiving Defendant's forensic evaluations, the certificate of restoration from the BOP, and holding a competency hearing, this Court determined Defendant was "able to understand the nature and consequences of the proceedings against him and to assist properly in his defense so long as certain accommodations [were] provided during any proceeding[.]" ECF No. 46. Accordingly, the Court found Defendant was restored to competency and the case against him was ordered to proceed. *See id.* The same day, Magistrate Judge Robert M. Levy arraigned Defendant on the Indictment and he pled not guilty to all counts. ECF No. 47.

On December 15, 2023, the parties filed a letter with the Court requesting a change-of-plea hearing. ECF No. 50. On December 18, 2023, the Court scheduled a change-of-plea hearing for March 1, 2024. ECF No. 51.

5

On January 18, 2024, defense counsel filed a letter notifying the Court of her concerns regarding Defendant's current competency and requesting a conference to discuss the same. ECF No. 53. On February 23, 2024, the Court denied defense counsel's request.

On March 1, 2024, this Court held the change-of-plea hearing, during which Defendant did not change his plea. In light of the hearing, the Court scheduled a jury trial to commence on August 5, 2024, which was later adjourned to October 28, 2024, and then February 24, 2025. ECF Nos. 54, 68, 71.

On October 3, 2024, this Court held another competency hearing. ECF No. 80. On October 15, 2024, the Court filed an order determining Defendant was "presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he [was] unable to understand the nature and consequences of the proceeding against him or to assist properly in his defense." ECF No. 83. Due to this finding, the Court committed Defendant to the custody of the BOP for hospitalization and treatment in a suitable facility. *Id.*

4. *Competency Restoration and Guilty Plea*

On August 7, 2025, after receiving Defendant's forensic evaluation and the BOP's certificate of restoration to stand trial, the Court scheduled a status conference for August 26, 2025, ECF No. 90, which was later adjourned to December 10, 2025. ECF No. 95.

On December 9, 2025, the parties jointly filed a letter informing the Court: (1) they intended to submit a proposed order finding Defendant restored to competency; (2) they reached a plea agreement resolving this case and intended to request a change-of-plea hearing at the Court's earliest convenience; and (3) Defendant may need informal accommodations—including short breaks to confer with defense counsel—to ensure he understands any future court proceedings. ECF No. 96. The Court granted this request the following day after a scheduled

6

status conference, ECF No. 99, and later scheduled a change-of-plea hearing for February 12, 2026. ECF No. 100.

On February 12, 2026, Defendant pled guilty to Counts One through Five of the indictment. *See* Plea ¶ 1. Pursuant to the Plea, Defendant agreed not to file an appeal or otherwise challenge his sentence if the Court imposes a term of 111 months' incarceration or below. *See* Plea ¶ 4. The Government further agreed "no further criminal charges [would] be brought against [Defendant] for" the criminal activity catalogued in all ten counts of the indictment. *Id.* ¶ 5(a). Additionally, the Government agreed "to dismiss the remaining counts of the Indictment with prejudice." *Id.*

The parties further agreed to "a forfeiture money judgment in the amount of one thousand, four hundred, and twenty dollars and zero cents ($1,4200.00)" pursuant to 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c) (the "Forfeiture Money Judgment"). *Id.* ¶¶ 6–12. On February 19, 2026, the Government filed a motion to enter a preliminary Order of Forfeiture, ECF No. 104, where Defendant agreed to pay the Forfeiture Money Judgment "no later than the date of [his] sentencing[,]" or otherwise "forfeit any other property of his up to the value of the outstanding balance[.]" Ord. of Forfeiture ¶¶ 2–3, ECF No. 105 (citing 21 U.S.C. § 853(p)). The same day, the Court granted this motion. *See id.*

Furthermore, the parties agreed in the Plea to mandatory restitution "in the full amount of each victim's losses as determined by the Court." Plea ¶ 1. On June 18, 2026, the Government filed a proposed Order of Restitution, ECF No. 116-4, asking this Court to impose mandatory restitution in the amount of $1,420.00 at the time of sentencing. *See* Gov't Sent'g Mem. at 10, ECF No. 116.

## II.    Legal Standard

Congress set forth the procedures for imposing a sentence in a criminal case in 18 U.S.C. § 3553. Together with 18 U.S.C. § 3553, the Guidelines operate as the "starting point and . . . initial benchmark" for a court evaluating a criminal sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). If and when a trial court chooses to impose a sentence outside of the Sentencing Guidelines range, the court "shall state, in open court, the reasons for its imposition of the particular sentence, and . . . the specific reason for the imposition of a sentence different from that described" in the Guidelines. 18 U.S.C. § 3553(c)(2). The court must also "state[] with specificity" its reasons for so departing "in a statement of reasons form." *Id.* The court's statement of reasons "shall be a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under § 3553(a)." *United States v. Davis*, 08-CR-332, 2010 WL 1221709, at *1 (E.D.N.Y. Mar. 29, 2010) (Weinstein, J.) (internal citation omitted).

When determining the appropriate sentence, the Court must consider seven different factors: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the kinds of sentence and the sentence range established by the Guidelines; (5) any pertinent policy statements issued by the U.S. Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar conduct; and (7) the need to provide restitution to victims of the offense. *See* 18 U.S.C. § 3553(a). The Court now addresses each factor in turn.

8

### III.  Analysis

**A. The Nature and Circumstances of the Offense and the History and Characteristics of Defendant**

The first § 3553(a) factor requires the Court to evaluate "the nature and circumstances of the offense and the history and characteristics of the defendant[.]" 18 U.S.C. § 3553(a)(1).

### 1.    *Family and Personal Background*

Defendant was born April 24, 1999, in Brooklyn, New York, to his parents, Benson Olaniyi and Ronke Olaniyi. *See* PSR ¶ 70. "Until age thirteen, [he] was raised in Brooklyn by both parents alongside his siblings in both public and private housing." *Id.* ¶ 73. Defendant reports "his basic needs were always met but noted he was frequently 'beat' with a belt by both parents . . . attribut[ing] this form of discipline to cultural norms of his Nigerian parents." *Id.*

Defendant's father, Benson, "abruptly returned to Nigeria[]" when Defendant was thirteen years of age. *Id.* ¶ 74. Benson "has been absent for the last fourteen years of [Defendant]'s life; thus, aside from his last known location to be an unknown city within Nigeria, his biographical information remains unknown." *Id.* ¶ 70. Defendant reports "[he] has infrequent contact with his father and has not spoken or communicated with him since his arrest." Def.'s Obj. to PSR at 1, ECF No. 114 (citing PSR ¶ 70); *see* Add. to PSR at 1–2, ECF No. 118.

Defendant's mother began working longer hours to provide financial support for the family[]" after Defendant's father left. PSR ¶ 74. Ronke stated Benson "provided limited emotional and financial support prior to his departure." *Id.* ¶ 76. With respect to this offense, "[Ronke] recalled being shocked on the date of the instant arrest as [Defendant] is a 'good boy' who routinely went to church with her." *Id.* "[She] stated that she eagerly awaits [his] release and intends to provide him with emotional and financial support while they continue to seek

treatment for [Defendant]'s neurological condition which she believes may have played a role in the commission of the instant offense." *Id.*; *see infra* Section III(A)(4).

Ronke is reported to be sixty years of age and residing in Brooklyn, New York, working "as a security guard[.]" PSR ¶ 70. "[Defendant] maintains a close relationship with his mother, who is aware of the instant offense and remains supportive." Add. to PSR at 1–2 (citing Def.'s Obj. to PSR at 1).

"[Defendant] has five siblings, all of whom are in good health." PSR ¶ 71. Patrick Olaniyi, who is thirty-two years of age, resides in Nigeria and works as "a full-time musician." *Id.* Anthony Olaniyi, who is thirty years of age, resides in Ohio and works "at a pharmacy." *Id.* Clinton Olaniyi, who is twenty-eight years of age, resides in Pennsylvania and works in construction. *See id.* Finally, Ololade Olaniyi, who is twenty-three years of age, resides with their mother in Brooklyn, New York, and works as "a full-time musician." *Id.* "[Defendant] maintains a close relationship with his siblings" and all "are aware of the instant offense and remain supportive." *Id.*

Defendant also has two paternal half-siblings, both of whom reside in Nigeria. *Id.* ¶ 72. Defendant has never met either of his half-siblings and their biographical information remains unknown to the Court. *Id.*

Otherwise, "[Defendant] has never been married and did not report any significant relationships[,]" nor has he "fathered any children." *Id.* ¶ 75. In addition to the above, the Court has considered the letters of support submitted on Defendant's behalf from his mother, Ronke, and brother, Clinton. *See* Def.'s Sent'g Mem., Exs. G–H, ECF No. 113.

2.        *Educational and Employment History*

The U.S. Probation Office ("Probation") reports Defendant earned a high school degree from the High School for Medical Professions, which he attended between July 2015 to July 2018. *See* PSR ¶ 98. In 2018, Defendant began attending Medgar Evers City University of New York in Brooklyn, New York. *See id.* ¶ 97. He reports withdrawing within approximately six months because "his classes were 'too hard.'" *Id.*

Defendant's first record of employment was in 2018, when he worked as a part-time stocker at Target in Brooklyn, New York. *See id.* ¶ 105. Defendant reported earning $1,300.00 in monthly gross income. *See id.* A reason for departing this role was not provided. *See id.*

In 2019, Defendant worked as a part-time stocker at Staples in Brooklyn, New York. *See id.* ¶ 104. Defendant reports earning $1,300.00 in monthly gross income. *See id.* Probation states "[Defendant] was terminated for coming to work late." *Id.*

From approximately 2019 until March 2020, Defendant worked as a part-time bartender and caterer at Lorelli's Catering in New York, New York. *See id.* ¶ 103. Defendant could not recall the income earned from his employment. *See id.* In March 2020, "[t]his position ended due to the COVID-19 pandemic[.]" *Id.* Defendant has been unemployed from March 2020 until the date of his arrest for the instant offenses. *See id.* ¶ 102.

After reviewing Defendant's financial position, Probation concludes "he appears unable to remit a fine[,]" particularly "given the priority of restitution[.]" *Id.* ¶ 111.

3.        *Prior Convictions*

Defendant does not have any prior juvenile adjudications or adult criminal convictions. *See id.* ¶¶ 63–68.

11

4.        *Physical and Mental Health*

On May 31, 2023, the BOP Mental Health Department at Federal Medical Center Butner in Bahama, North Carolina, conducted an evaluation of Defendant (the "Forensic Evaluation"). *See id.* ¶ 80.  Probation reports much of Defendant's physical, mental and emotional health "was gleaned from [the] Forensic Evaluation." *Id.* ¶¶ 80, 86.

Defendant was first diagnosed with cerebral cavernous malformations ("CCM")[2] following magnetic resonance imaging ("MRI") in November 2014.  *See id.* ¶ 81.  Results from MRIs completed in February 2019 and March 2021 found Defendant neurologically intact.  *See id.*

Nevertheless, "[Defendant] attributes chronic headaches and poor memory to his diagnosis of CCM." *Id.*  Medical records from the Metropolitan Detention Center, Brooklyn (the "MDC") "reflect that [Defendant] continued to present to 'sick call' for reports of headaches for which he is provided Ibuprofen and Tylenol 'with little relief of his symptoms.'" *Id.* ¶ 84.

Otherwise, with respect to his physical condition, "[Defendant] denied any major injuries or illnesses as a child." *Id.* ¶ 83.

Mentally, "[Defendant]'s cognitive compromises are best characterized as a mild neurocognitive disorder, due to another medical condition." *Id.* ¶ 99 (internal quotation marks omitted).  Due to Defendant's "history of intracerebral hemorrhage dating back to 2014, and subsequent post-traumatic intellectual disability," "[his] intellectual functioning was noted to be below average, and he tended to be concrete in his thinking." *Id.* ¶ 82 (internal quotation marks omitted).  "The evaluating forensic psychological and neuropsychologist noted that [Defendant] was often tangential, at times irrational, presented with thought blocking and poverty of thinking,

---

[2] CMM are lesions in the brain that can leak blood into the brain and cause neurological symptoms such as headaches, paralysis, seizures, or hearing and vision[] changes.  PSR ¶ 81 n.2.

12

and was a poor historian with limited insight and judgment." *Id.* ¶ 86 (internal quotation marks omitted). Ultimately, the Forensic Evaluation determined Defendant has a full-scale intelligence quotient of 79 under the Wechsler Adult Intelligence Scale, "which falls at the high end of the borderline range." *Id.* ¶ 99.

Defendant's behavior while in custody was often attributed to his mental condition by the jail's medical professionals. While incarcerated, "he admitted to hearing voices that t[old] him good and bad things and disclosed that he experience[d] visual hallucinations but was unable to describe them." *Id.* ¶ 87 (internal quotation marks omitted). Additionally, "[Defendant] previously contemplated suicide as he d[id] not want to be incarcerated and has a history of head banging." *Id.* ¶ 88 (internal quotation marks omitted). However, he "verbalized his family, friends, and religion" were "protective factors that would prevent him from attempting suicide." *Id.* (internal quotation marks omitted).

In December 2025, Defendant received a diagnosis of "Unspecified Schizophrenia" while in custody at the Federal Detention Center, Philadelphia, "for which he is prescribed four milligrams of risperidone daily, an antipsychotic." *Id.* ¶ 92; Add. to PSR at 2 (citing Def.'s Obj. to PSR at 1). In February 2026, Defendant "denied experiencing auditory or visual hallucinations, denied paranoid ideation, and did not verbalize any delusional beliefs." PSR ¶ 93. "Moreover, he denied suicidal and homicidal ideation, intent, and planning." *Id.*

Finally, "[Defendant] was treated with ten milligrams of buspirone twice daily to treat anxiety which was discontinued in December 2025 due to continued non-compliance." *Id.* ¶ 92.

In addition to the above, the Court has considered the testimony from Dr. Drew Nagele and supporting medical records submitted on Defendant's behalf. *See* Def.'s Sent'g Mem., Ex. A–E.

5.        *Substance Abuse*

Defendant began using marijuana as early as age eighteen.  PSR ¶ 94.  "For several months prior to the instant arrest, [Defendant] had been smoking an unspecified quantity of marijuana daily[.]"  *Id.*  Defendant's medical records from the MDC indicate "a history of substance induced psychosis," causing him to "engage[] in disruptive behaviors."  *Id.* ¶ 95.

Defendant claims he has maintained sobriety for an unspecified time period while in custody, Def.'s Sent'g Mem. at 6, but "do[es] not oppose a special condition for drug testing and treatment to monitor his sobriety."  Def.'s Sent'g Mem. Supp. at 1, ECF No. 117.

Otherwise, Defendant reports no "history of problematic alcohol consumption and denied ever using illicit substance, misusing controlled substances, or attending substance abuse treatment.  PSR ¶ 96.

6.        *Nature and Circumstances of the Offense*

The Court's previous statements address the nature and circumstances surrounding the instant offense.  *See supra* Part I.

**B.  The Need for the Sentence Imposed**

The second § 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]"  18 U.S.C. § 3553(a)(2).

The Court's sentence recognizes the seriousness of Defendant's conduct.  "[Defendant] used a firearm to terrorize no fewer than six individuals and three convenience stores in his

neighborhood in a four-month crime spree." Gov't Sent'g Mem. at 7. "Choos[ing] to victimize the same locations or the same people—all in his same neighborhood"—reveals a tremendous disrespect for the law and his own community. *Id.* at 7–8.

The Court's sentence will deter Defendant and others from engaging in similar conduct, justly punish Defendant for his crimes, and protect the public from Defendant's actions. Accordingly, the Court's sentence is "sufficient, but not greater than necessary" to comply with the purposes set forth in this factor. 18 U.S.C. § 3553(a)(2).

## C. The Kinds of Sentences Available

The third § 3553(a) factor requires the Court to detail "the kinds of sentences available" for Defendant. 18 U.S.C. § 3553(a)(3).

Defendant pled guilty to four counts of Hobbs Act robbery and one count of attempted Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a). Plea ¶ 1. Defendant faces a maximum term of twenty years' incarceration per count. 18 U.S.C. § 1951(a).

Defendant also faces a maximum term of three years' supervised release per count. *Id.*; 18 U.S.C. §§ 3559 (a)(2), 3553(b)(1). If a condition of supervised release is violated, Defendant may be sentenced up to 2 years without credit for pre-release imprisonment or time previously served on post-release supervision. 18 U.S.C. § 3583(b), (e). Defendant is also eligible for a term of probation of one to five years per count. 18 U.S.C. § 3561(c)(1). Multiple terms of supervised release or probation shall run concurrently. 18 U.S.C. § 3624(b), (e). Unless extraordinary circumstances exist, the Court must impose one of the following as a condition of probation: a fine, restitution, or period of community service. 18 U.S.C. 3563(a)(2).

In addition to facing terms of incarceration, probation, and supervised release, Defendant faces a maximum fine of $250,000.00 per count. 18 U.S.C. § 3571(b).

**D. The Kinds of Sentence and the Sentencing Range Established for Defendant's Offense**

The fourth § 3553(a) factor requires the Court to discuss "the kinds of sentence and the sentencing range established for . . . [t]he applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[.]" 18 U.S.C. § 3553(a)(4)(A).

Pursuant to the U.S. Sentencing Guidelines (the "Sentencing Guidelines," "Guidelines," or "U.S.S.G."), the Government and Defendant stipulated to a Total Adjusted Offense Level of 26 in the Plea.[3] *See* Plea ¶ 2.

*1.   Base Offense Level with the Specific Offense Characteristic*

The applicable Guidelines provision is § 2B3.1, which covers, *inter alia*, forms of robbery. *See* U.S.S.G. § 2B3.1. Under § 2B3.1(a), each of the five counts has a Base Offense Level of 20. U.S.S.G. § 2B3.1(a); PSR ¶¶ 25, 31, 37, 43, 49; Gov't Sent'g Mem. at 5–6.

Additionally, "[Defendant] stipulated that his Guidelines range should be calculated based on his possession and brandishing of a firearm in connection with all five incidents." Gov't Sent'g Mem. at 5; *see* Plea ¶ 2. Therefore, a five-level adjustment applies to all five counts under U.S.S.G. § 2B3.1(b)(2)(C) because "a firearm was brandished or possessed" by Defendant during the offensive conduct. U.S.S.G. § 2B3.1(b)(2)(C); PSR ¶¶ 26, 32, 38, 44, 50; Gov't Sent'g Mem. at 5–6. Therefore, the Subtotal Adjusted Offense Levels are 25 for Counts One, Two, Three, Four, and Five. PSR ¶¶ 30, 36, 42, 48, 54; Gov't Sent'g Mem. at 5–6.

---

[3] The parties initially calculated a Subtotal Adjusted Offense Level of 29. *See* Plea ¶ 2. The Total Adjusted Offense Level the parties stipulated to is 26 because the Subtotal Adjusted Offense Level was subject to a two-level reduction "[i]f [Defendant] clearly demonstrate[d] acceptance of responsibility," and one-level reduction "if [Defendant] . . . accepted responsibility as described" in the Plea, "to the satisfaction of the [Government], and if [he] ple[d] guilty on or before January 14, 2026[.]" *Id.* While Defendant signed the Plea on December 10, 2025, Defendant's guilty plea was not accepted by this Court until a change-of-plea hearing on February 12, 2026. ECF No. 101.

16

### 2.    *Multiple Count Analysis for the Combined Offense Level*

The applicable Guidelines provision is § 3D1.2, which provides rules for grouping closely related offenses in a multiple-count case.  *See* U.S.S.G. § 3D1.2.  Pursuant to U.S.S.G. § 3D1.2, Counts One through Five of the Indictment—to which Defendant has pled guilty—may not be grouped together.  *See id.*; PSR ¶ 24.

To calculate Defendant's combined offense level, U.S.S.G. § 3D1.4(a) instructs the Court to assign one unit per count because they are of equal seriousness, and none have a higher offense level than the others.  *See* PSR ¶ 55 (citing U.S.S.G. § 3D1.4(a)) ("One unit is assigned to the count with the highest offense level. One additional unit is assigned for each count that is equally serious from 1 to 4 levels less serious.").  Thus, for the multiple count adjustment, the total number of units for the offenses charged is 5.0.  *Id.*; Gov't Sent'g Mem. at 6.

Pursuant to the table at U.S.S.G. § 3D1.4, a total of 5.0 units entitles Defendant to a four-level adjustment, which is applied to the Subtotal Adjusted Offense Level "applicable to the Group with the highest offense level[.]"  U.S.S.G. § 3D1.4; PSR ¶ 57; Gov't Sent'g Mem. at 6.  Given each count has the same Subtotal Adjusted Offense Level—with none being higher than the other—4 levels are added to a Subtotal Adjusted Offense Level of 25.  PSR ¶ 56; Gov't Sent'g Mem. at 6.  The resulting combined offense level is 29.  PSR ¶ 58.

### 3.    *Total Adjusted Offense Level and Guidelines Range*

Probation and the Government agree a mitigating factor should apply to Defendant pursuant to the Guidelines.  Probation and the Government agree a three-level reduction should apply for Defendant's timely acceptance of responsibility under U.S.S.G. § 3E1.1(a) and (b).  U.S.S.G. § 3E1.1(a)–(b); PSR ¶¶ 59–60; Gov't Sent'g Mem. at 6.

Defendant did not provide a Guidelines calculation in his sentencing memorandum but agrees with Probation and the Government's calculations while also acknowledging "[Defendant] has accepted responsibility for committing four robberies and one attempted robbery of three bodegas in the East New York neighborhood of Brooklyn between February and June 2021." Def.'s Sent'g Mem. at 1–2.

All parties agree Defendant's Criminal History Category is I because he does not have any prior juvenile adjudications or adult criminal convictions. PSR ¶¶ 63–68; Gov't Sent'g Mem. at 6; Def.'s Sent'g Mem. at 6.

The parties agree, pursuant to the Guidelines Sentencing Table, a Total Adjusted Offense Level of 26 and a Criminal History Category of I results in a Guidelines range of sixty-three (63) to seventy-eight (78) months' incarceration. U.S.S.G. § 5A; PSR ¶ 113; Gov't Sent'g Mem. at 6; Def.'s Sent'g Mem. at 1. This Guidelines range is subject to a twenty-year statutory maximum for each count pursuant to 18 U.S.C. § 1951(a). *See* Plea ¶ 1.

This Court appreciates the sentencing arguments raised by all parties and has seriously considered each in turn.

### E. Pertinent Policy Statement(s) of the Sentencing Commission

The fifth § 3553(a) factor requires the Court to evaluate "any pertinent policy statement . . . issued by the Sentencing Commission." 18 U.S.C. § 3553(a)(5).

The parties have not drawn the Court's attention to any applicable policy statements. Finding none of its own, the Court proceeds to the next § 3553(a) factor.

18

### F.  The Need to Avoid Unwarranted Sentence Disparities

The sixth § 3553(a) factor requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]"  18 U.S.C. § 3553(a)(6).

Defendant speaks at length about his current custodial period in conjunction with avoiding unwarranted sentencing disparities.  Defendant highlights "[he] has served more than the average and median sentence that federal courts impose in robbery cases for similarly situated defendants[,]" stating "he has effectively served a guidelines term: with good conduct time credited, he has been imprisoned for the equivalent of a 65-month sentence, within his recommended range." Def.'s Sent'g Mem. at 1.

Defendant cites data from the Sentencing Commission's Judiciary Sentencing Information tool to state "in the last five years, there were 68 defendants like [him] . . . exclud[ing] defendants who received § 5K1.1 departures." *Id.* at 6 (citing Ex. F. at 1).  "The average sentence imposed for this group was 55 months' imprisonment; the median sentence was 60 months." *Id.*  Therefore, Defendant argues "[his] requested sentence is longer than the average and median sentences imposed upon similarly situated robbery defendant[,]" and thus "does not create an unwarranted disparity." *Id.*

Defendant also highlights his good conduct time ("GCT"), for which he claims he is "eligible for 54 days' credit for [GCT]" per year he has served, which "yields a maximum discount of 270 days for his five years' pretrial detention. *Id.* at 7 (citing 18 U.S.C. § 3624(b)(1)).  He admits to "los[ing] GCT for some of those years because of disciplinary violations," but should still be eligible for 135 days' GCT—"half the otherwise allowable 270 days—for the years of June 14, 2021-June 13, 2022 (54 days GCT),  June 14, 2022-June 13,

2023 (54 days GCT), and June 14- 2024-June 13, 2025 (27 days GCT)." *Id.* Defendant calculates "[he] has already served more than the bottom of his [G]uidelines range" because this GCT credit added to the amount of time he will have served by the time of sentencing equates to 1,976 days, which is "equivalent to a sentence of five years and 151 days—or approximately 65 months." *Id.*

In response, the Government argues a Guidelines sentence would not result in unwarranted sentencing disparities. "[L]eaving aside [Defendant]'s misconduct in jail," the Government states "a Guidelines sentence here would be similar to those imposed in similar situated cases." Gov't Sent'g Mem. at 8. Furthermore, the Government observes "in cases where a firearm was brandished in connection with a robbery, numerous judges in this district have imposed sentences of 84 months' imprisonment or higher based on a violation of 18 U.S.C. § 924(c)(1)(A)(ii)." *Id.*

The Court has reviewed and considered carefully the parties' arguments. For the reasons stated in this Memorandum and Order, and considering the other six § 3553(a) factors, the Court's sentence avoids unwarranted sentence disparities.

### G. The Need to Provide Restitution

Finally, the seventh § 3553(a) factor requires the Court to touch upon "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7).

Pursuant to the Plea, Defendant agreed to a Restitution Order "in the full amount of each victim's losses as determined by the Court." Plea ¶ 1(e). On June 18, 2026, the Government filed a proposed Order of Restitution, requesting this Court sign and impose mandatory restitution in the amount of $1,420.00 at the time of sentencing. *See supra* Part I(B)(4) (citing Gov't Sent'g Mem. at 10). The Court will issue a Final Order of Restitution accordingly.

20

## IV.    Conclusion

For the reasons set forth above, the Court sentences Defendant to sixty-three (63) months' incarceration; three (3) years of supervised release with both the standard and special conditions of supervision; restitution in the amount of $1,420.00 as identified in the forthcoming Order of Restitution; forfeiture of U.S. currency and items identified in the preliminary Order of Forfeiture, issued on February 19, 2026; and a $500.00 mandatory special assessment.  This sentence is sufficient, but not greater than necessary, to accomplish the purposes of § 3553(a). The Court does not impose a fine given Defendant's present financial circumstances.

The Court expressly adopts the factual findings of the PSR, and addenda thereto, as corrected herein, to the extent those findings are not inconsistent with this opinion.  The Court advises Defendant he has fourteen (14) days to appeal the order and judgment of this court from the date the order and judgment are entered.

SO ORDERED.

s/WFK

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated:  July 1, 2026
        Brooklyn, New York

21